UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

HONORABLE TERRY J. HATTER, JR., JUDGE PRESIDING

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| PLAINTIFF(S), ) | |
| ) | |
| ) | |
| VS. ) | NO. CR 02-157-TJH |
| ) | |
| JOSEPH HAYES, AKA "JOEY," ) | |
| ET AL, ) | |
| DEFENDANT(S), ) | |
| _____ ) | |

ORIGINAL

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

THURSDAY, JANUARY 9, 2003

MARIA BEESLEY, RPR
OFFICIAL REPORTER
145 U.S. COURTHOUSE
3470 TWELFTH STREET
RIVERSIDE, CALIFORNIA 92502
(909) 369-9404

Entered on ICMS   6/16/03

1                    A P P E A R A N C E S

2

3        FOR THE PLAINTIFF:

4             DEBRA YANG,
              United States Attorney
5             JACKIE CHOOLJIAN,
              Assistant United States Attorney
6             Chief, Criminal Division
              MARK AVEIS,
7             ADAM KAMENSTEIN,
              Assistant United States Attorney
8             312 North Spring Street
              Los Angeles, California 90012

9

10

11       FOR THE DEFENDANT JOSEPH HAYES, AKA "JOEY":

12            ELLEN BARRY, ATTORNEY AT LAW
              LAW OFFICES OF ELLEN BARRY
13            316 West 2nd Street, Suite 1202
              Los Angeles, California 90012

14

15

16       FOR THE DEFENDANT MICHAEL BRIDGE, AKA "SNAKE":

17            OFFICE OF THE FEDERAL PUBLIC DEFENDER
              MARIA STRATTON,
18            FEDERAL PUBLIC DEFENDER
              MICHAEL GARCIA,
19            ALICIA BLANCO,
              Deputy Federal Public Defender
20            321 East Second Street
              Los Angeles, California 90012-4206

21

22            MARK OVERLAND, ESQUIRE
              OVERLAND & BORENSTEIN, LLP
23            6060 Center Drive, Seventh Floor
              Los Angeles, California 90045

24

25

**FOR THE DEFENDANT TY FOWLES:**
    DALE RUBIN, ESQUIRE
    LAW OFFICES OF DALE M. RUBIN
    2555 Huntington Drive, Suite A
    San Marino, California 91108

**FOR THE DEFENDANT WILLIAM RICHIE, AKA "KREEPER":**

    DAVID PHILLIPS, ESQUIRE
    LAW OFFICES OF DAVID PHILLIPS
    3853 Brockton Avenue
    Riverside, California 95201

**FOR THE DEFENDANT ROBERT BALTIMORE, AKA "WIGMO":**

    MICHAEL WHITE, ESQUIRE
    WHITE & LASTING
    1717 4th Boulevard, 3rd Floor
    Santa Monica, California 90401

**FOR THE DEFENDANT JAMES PRESCOTT, AKA "IRISH":**

    ELLIOT E. STANFORD, ESQUIRE
    LAW OFFICES OF ELLIOT E. STANFORD
    15332 Antioch Street, Suite 526
    Pacific Palisades, California 90272

**FOR THE DEFENDANT JAMES MOWATT, AKA "MO":**

    PAUL HORGAN, ESQUIRE
    LAW OFFICES OF PAUL HORGAN
    800 Wilshire Boulevard, Suite 1510
    Los Angeles, California 90017

**FOR THE DEFENDANT JENNIFER D'ANNA:**

    THOMAS NISHI, ESQUIRE
    LAW OFFICES OF THOMAS NISHI
    1000 Wilshire Boulevard, Suite 600
    Los Angeles, California 90017

1           **LOS ANGELES, CALIFORNIA; THURSDAY, JANUARY 9, 2003**

2                     **\* \* \* \***

3        THE CLERK:  Second item on the calendar, criminal

4    action CR 02-157.  U.S.A. versus Joseph Hayes, et al.

5        Counsel, please make your appearances.

6        MR. KAMENSTEIN:  Good afternoon, Your Honor.  On

7    behalf of the United States, Adam Kamenstein.

8        THE COURT:  Thank you.

9        MR. KAMENSTEIN:  Present with me at counsel table is

10   assistant U.S. attorney Mark Aveis and FBI special agent David

11   Bolt.  Also in the courtroom, Your Honor, is the acting warden of

12   MDC Don Gregory and other associates from MDC.

13       THE COURT:  Fine.  Thank you for being here.

14       MS. BARRY:  Good afternoon, Your Honor.  Ellen Barry

15   on behalf of Joseph Hayes.

16       THE COURT:  Thank you.

17       MR. HARRIS:  Good afternoon, Your Honor.  William

18   Harris and Michael White on behalf of Robert Baltimore.

19       THE COURT:  Thank you, Mr. Harris.

20       MR. RUBIN:  Good afternoon, Your Honor.  Dale Rubin

21   on behalf of Mr. Fowles who is present in custody.  I'm also

22   standing in for Ms. Leyva, for Mr. Stambler, and Mr. Callahan as

23   to their respective clients.  My understanding is that each of

24   their clients has a waiver on file, and they're not here.

25       THE COURT:  Thank you for that.

1    MR. STANFORD:  Good afternoon, Your Honor.  Elliot

2  Stanford on behalf of James Prescott who is present in custody.

3    THE COURT:  Thank you, Mr. Stanford.

4    MR. GARCIA:  Good afternoon, Your Honor.  Michael

5  Garcia, Mark Overland and Alicia Blanco on behalf of Mr. Bridge.

6  He is present.

7    THE COURT:  Thank you all.

8    MR. PHILLIPS:  Good afternoon, Your Honor.  David

9  Phillips for Mr. Richie.

10    THE COURT:  Thank you.  All right.  Does that cover

11  it?

12    MR. RUBIN:  I don't see Mr. Bakman here.  I will

13  certainly stand in for him as well.  I don't know who else is

14  missing.

15    THE COURT:  Who is representing Ms. D'Anna?

16    DEFENDANT D'ANNA:  Mr. Nishi.

17    THE COURT:  Have you been in contact with him

18  recently?

19    DEFENDANT D'ANNA:  Yes.  I was in contact with him

20  about a week and a half ago and he said he would be here today.

21    THE COURT:  So he may be caught in traffic.  Will

22  someone stand in for Mr. Nishi until he gets here?

23    MS. BARRY:  I will, Your Honor.  I believe Mr. Horgan

24  is also not here, and I will stand in for him as well.  There he

25  is.

1          MR. HORGAN:  I'm sorry I'm delayed.  Paul Horgan for

2    Mr. Mowatt.

3          THE COURT:  Who wishes to be heard?  Mr. Kamenstein?

4          MR. KAMENSTEIN:  Adam Kamenstein for the United

5    States.

6          Your Honor, we're here today, I believe, on counsel's

7    motion regarding -- primarily regarding security issues at MDC.

8    I understand from conversations with certain counsel here today

9    that some of those issues that had previously been raised are now

10   moot, but certain issues remain.  I want to quickly, if I might,

11   address the court on certain efforts that have been made with

12   respect to security issue concerns that have been raised by

13   defense counsel and just apprise the court of where the Bureau of

14   Prisons and the government stands with respect to some of those

15   issues.

16         Primarily, Your Honor -- and I'm not going to presume

17   to speak for defense counsel.  So I'm just obviously iterating

18   what my understanding of those issues is.  Primarily the main

19   issue was restraints during attorney-client visits at MDC.

20   When the decision to restrain those inmates during attorney-

21   client visits was made, MDC was run by Warden Seifert who has

22   since retired.  MDC is now being run by Acting Warden Don Gregory

23   who is here to answer any questions the court may wish to pose to

24   him.

25         Acting Warden Gregory, in consultation with the

1    warden who has been appointed to run MDC but not yet arrived, has

2    made the decision that these defendants will no longer be

3    shackled in any manner during attorney-client meetings with

4    respect to one defendant, that being Joseph Hayes, and I'll

5    address that matter in just a moment.  Therefore, I would submit

6    to the court that that issue, which has taken up a good deal of

7    the court's time up to this point seems to have been obviated by

8    Acting Warden Gregory's decision to no longer shackle the

9    defendants during attorney-client meetings.

10              THE COURT:  I appreciate that, but I have some

11   concerns myself.  Handed to me just before I came on the bench

12   were two pictures here supposedly indicating weapons that have

13   been devised by somebody.  Could you tell me about that?  Because

14   very frankly, either an individual is going to have to be strip

15   searched or something before he meets with his respective lawyer,

16   or he may have to continue with some kind of restraints.

17              MR. KAMENSTEIN:  Absolutely, Your Honor.  And I was

18   planning on coming to that issue in just a moment.  When we came

19   to the court we only had two sets of those photocopies.  We

20   handed one set to the court and one set to counsel for

21   Mr. Bridge subsequent to Your Honor entering the courtroom.  We

22   received copies for all defense counsel.  So if I may just hand

23   it so they can pass it out to themselves.

24              THE COURT:  Certainly.

25              MR. KAMENSTEIN:  If your Honor will just bear with me

1    one moment, I will come soon to that issue.  So with respect to

2    the shackling, that issue has been obviated except for defendant

3    Hayes.  And the B.O.P. has made a measured decision to not remove

4    the shackling from defendant Hayes.  The crux of the argument

5    over the allegations that have been made known to us by defense

6    counsel up to this point essentially stem from their belief that

7    the decision to treat these defendants as they have been is a

8    result of some sort of vindictiveness or that it's not a studied

9    or measured response to the security threat that they pose.

10          That, I think, is belied by the fact that some of the

11   issues that I'm going to discuss, but particularly with respect

12   to the fact that all defendants have been unshackled except for

13   defendant Hayes.  And the reason that defendant Hayes has not

14   been unshackled, Your Honor, is because MDC personnel feel that

15   defendant Hayes continues to pose a threat to the security not

16   only of staff but of visitors.

17          And one such reason supporting that belief, Your

18   Honor, is the fact that just several weeks ago, during the month

19   of December, an incident occurred -- MDC had recently changed the

20   plumbing system.  Acting Warden Don Gregory was making rounds

21   through MDC when defendant Hayes was urinating in his cell.

22   Defendant Hayes instructed Acting Warden Gregory to flush his

23   toilet for him.  When Acting Warden --

24          THE COURT:  He instructed him?

25          MR. KAMENSTEIN:  Instructed.  I use that term because

1    I think that described the manner in which he asked him to do it.

2    When Acting Warden Gregory refused to flush defendant Hayes'

3    toilet, defendant Hayes turned around with a, I believe a plastic

4    cup in his hand and rammed it and his fist into the plexiglass

5    window separating his cell from where Acting Warden Gregory was.

6    Acting Warden Gregory's face was directly on the other side of

7    that cell.

8         Those plexiglass windows have been broken before by

9    inmates.  Obviously if defendant Hayes were successful in

10   breaking that plexiglass shield, or window rather, Acting Warden

11   Gregory could have suffered some serious injury, possibly

12   including blindness given the proximity of his face to that.

13   Defendant Hayes was administratively found guilty, if that's the

14   appropriate term, for that conduct.  Thus, that's an example of

15   the kind of evaluation or the basis for the kind of evaluation

16   that the B.O.P. personnel make in deciding whether or not an

17   inmate poses a continuing risk.  Defendant Hayes, it was

18   determined, based on that incident, does continue to pose such a

19   risk.

20        Additionally, Your Honor -- and obviously I don't

21   need to reiterate the obvious, which is the nature of the

22   indictment and the fact that unlike any other case of scale of

23   this proportion, these defendants are all charged, I think, in

24   almost every predicate act of the indictment with violence

25   occurring inside of a custodial sitting.  Unlike other big cases,

1    18th Street gang, Mexican Mafia, I think with the exception of

2    the AB case also now before the court or another court, this is

3    the only case in which 99 percent of the violent acts occurred in

4    a custodial setting.  That alone would certainly cause any

5    reasonable propriety of MDC to be concerned about security

6    issues.

7                 That concern continues to be borne out.  And I want

8    now to turn to the point Your Honor made a moment ago with

9    respect to the photos that were handed to the court and to

10   defense counsel.  The day before yesterday -- or yesterday,

11   rather, defendant Bridge's cell was search.  And from defendant

12   Bridge's cell several items were recovered.  Among those items

13   recovered were, as exhibited in the photograph, this item which

14   I'm holding in my hand, Your Honor.  This is a homemade weapon.

15   And it is extraordinarily hard.  And I would be happy to hand it

16   to the court if the court would like to feel it.

17                 In addition to that item having been recovered just

18   yesterday from defendant Bridge's cell, also recovered were razor

19   blades.  Now, razor blades are not permitted at all in the

20   secured housing units.  And I believe something like six razor

21   blades were recovered from defendant Bridge's cell.  In addition

22   to that, various other instruments used for communicating with

23   other inmates commonly referred to as fishing line which is made

24   from cut up sheets tied together, were also recovered just

25   yesterday from defendant Bridge's cell.

1          This occurs, Your Honor, on the heels the day after

2     it was suspected by B.O.P. personnel that defendant Bridge was

3     under the influence of some sort of substance.  Defendant

4     Bridge's pupils were dilated, his speech was slurred.  When they

5     attempted to extract him for purposes of taking a urinalysis

6     test, defendant Bridge delayed and refused and ultimately was

7     forced to comply.  So the day after he is suspected of being

8     under the influence of a controlled substance, these weapons are

9     recovered from his cell.

10          THE COURT:  You say he was forced to comply, however?

11          MR. KAMENSTEIN:  Ultimately compliance was had and --

12          THE COURT:  What were the results of the test?

13          MR. KAMENSTEIN:  That won't be known for about two

14     weeks, Your Honor.  That's how long the test takes.  Despite the

15     fact that these weapons were recovered from defendant Bridge's

16     cell yesterday -- and I bring this up because I think it does

17     show the measured response MDC is taking -- contrary to some

18     allegations that have been made in the past, despite these

19     incidents with defendant Bridge, pending the evaluation of his

20     urinalysis and pending any proceeding with respect to the weapons

21     recovered from his cell, I'm informed by Acting Warden Gregory

22     that they are still going to allow him unrestricted or unshackled

23     meetings with his attorney because that is what defense counsel

24     have been asking for for several months, and that is what it has

25     appeared to all parties that the court was inclined to grant.

1    THE COURT:  Well, I was not inclined to grant it if

2    indeed it was not a quid pro quo.  And simply stated, that if we

3    were going to provide the kinds of rights that normally are

4    provided, then there would have to be a responsibility to carry

5    out those rights responsibly.  And while these individuals are

6    being tried in one case, they do have their individual rights,

7    and they will be looked at individually.

8         And at this point I'm not prepared to have either

9    Mr. Hayes nor Mr. Bridge, I mean subject, of course, to listening

10   to counsel, their respective counsel, if what you tell me is

11   borne out with regard to either or both of these gentlemen, I'm

12   not prepared to allow them to be unshackled.  No.

13        MR. KAMENSTEIN:  And of course, Your Honor, I merely

14   make this by way of offer of proof.  Acting Warden Gregory is

15   more than pleased to answer any questions the court may have to

16   bear out what  I have laid out before the court.

17        In sum, Your Honor, it appears to the government that

18   the personnel at B.O.P. are taking a very measured approach to

19   the security issues that these defendants very definitely pose

20   not only to staff at MDC, but to their own attorneys.  It doesn't

21   need a long explanation to note that were an unshackled defendant

22   to bring an item such as this or a razor blade into an attorney-

23   client meeting, the consequences of that could be severe.

24        THE COURT:  Well again, as I say, while they're being

25   tried together, each has to be responsible for his own actions.

1    And I'm not necessarily going to have any blanket order with

2    regard to all of the individuals, but we will look at them

3    individually.

4              MR. KAMENSTEIN:  I agree.  The government does not

5    disagree with that, Your Honor.  The government shares that view.

6    The government's point is only that MDC, obviously dealing with

7    these people every day, are in the best position to make security

8    threat determinations as incidents arise or don't arise.  And it

9    seems to me that they have or are trying, as best as they can, to

10   exercise that discretion in a responsible manner.

11             THE COURT:  Well, I want to ensure the defendants

12   here that that will be the case.  And again, I don't think any

13   single individual defendant should feel that his particular

14   rights or her right in any way is going to be abridged because of

15   what some others do.  So unless an individual has some in way

16   stepped out of line, then he or she is going to enjoy the rights

17   that he would have.  They have been charged; they have been not

18   been found guilty of these charges at this point.

19             So they have an opportunity that is being given to

20   them.  If they in any way jeopardize that opportunity, it will be

21   taken away.  But it's not going to be taken away jointly.  It

22   will be taken away by an individual that shows that he or she

23   cannot accept the responsibility for having the right.

24             MR. KAMENSTEIN:  Thank you, Your Honor.

25             THE COURT:  All right.  Ms. Barry.

MS. BARRY:  Thank you, Your Honor.  I would like to start off first by clarifying some issues with regard to Mr. Hayes' incident with the associate warden, but I also wanted to let the court know that beyond the issues that relate to MDC, the defendants jointly have a number of issues that we would like to have resolved today.  Just so that we can get to that once we've resolved these issues.

With regard to the incident between Mr. Hayes and A.W. Gregory, as I understand it, on the inside of the cell over the window which Mr. Hayes supposedly banged the cup against, the window itself is made of plexiglass that has wires in it.  Over that window is essentially a cage made of wires so that you can't get through the glass from the inside.

THE COURT:  But can you shatter the glass?

MS. BARRY:  No, you can't.  If in fact Mr. Hayes had assaulted the window with the violence with which it was just reported, one would expect there would have been some harm or damage to Mr. Hayes' hand.  And we have absolutely no evidence of that.  What evidently happened here is that there was a dispute between the two men.  Whether it was provoked by Associate Warden Gregory who was standing outside Mr. Hayes' window and peering in at him as he urinated I think is something that the court should consider.

The man is having a private moment.  He is attempting to urinate.  The warden is standing there watching him urinate.

1  Mr. Hayes looks at him and says, "Flush my toilet," because he

2  can't flush his own toilet because the button is on the outside

3  of the cell, not the inside of the cell.  Associate Ward Gregory

4  who's standing there right next to the button says "No." And then

5  supposedly this incident with the banging on the door occurred.

6         It did not occur with the violence with which it was

7  just reported.  Nonetheless, within the internal processes of the

8  MDC an adjudication has been made finding Mr. Hayes guilty of

9  this offense.  I think that what the court should consider is

10  that the sanctions that the MDC decides it wants to take out on

11  Mr. Hayes for his conduct should not be sanctions that affect my

12  relationship with Mr. Hayes.

13         I don't fear Mr. Hayes.  I don't feel that he is

14  going to assault me.  And I don't say that lightly.  I have been

15  in this business for 17 years.  This is not the first client that

16  I have had who has a history such as Mr. Hayes in the sense that

17  he is serving a life sentence, he comes to a maximum security

18  prison.  I think that I'm able to judge for myself whether or not

19  I have any fear for my own safety.

20         And I understand that the institution has an

21  obligation, above and beyond my own concerns, to safeguard me

22  whether or not I want to be safeguarded, because they face a

23  civil suit if something does, in fact, happen to me.  But I think

24  what the court ought to focus on -- I think what is happening

25  here is that Mr. Hayes has been identified both by the government

1   and by the institution as being the leader of the rest of these.

2   And there is provocation that's occurring on both sides.

3        When this incident happened, the words that came out

4   of Associate Warden Gregory's mouth was, "Now I got you."  And I

5   think that is evidence of the provocation.  And in fact, when we

6   met with the associate warden filing this incident which I think

7   was the next day or the day after, he brought it up.  So I think

8   the court should consider the whole picture when it considers

9   whether or not this sanction of chaining him down when he is

10  visiting with me is the appropriate sanction.

11       There's other things that the institution can and

12  does do in an attempt to get inmates to conform to the rules of

13  conduct that they're supposed to conform to.  And I have nothing

14  to say about that.  The only concern I have is my relationship

15  with my client and whether or not it's being handled --

16       THE COURT:  I understand.  And as I indicated,

17  subject to listening to respective counsel for these defendants I

18  would make a determination.  All right.

19       Let the reflect Mr. Nishi is joining us as well.

20       MS. BARRY:  If the court please, I would like to give

21  Mr. Bridge's attorneys an opportunity to speak on this issue and

22  then I'd like to come back and take up the other issues I'd like

23  to address.

24       THE COURT:  You may.

25       MR. GARCIA:  One moment, Your Honor.

1          THE COURT:  Certainly.

2      (Counsel confers with defendant.)

3          MR. GARCIA:  Your Honor, to echo some of the comments

4  of Ms. Barry.

5          THE COURT:  Mr. Garcia, would you indicate your

6  representation for the record.

7          MR. GARCIA:  Thank you for reminding me.  Michael

8  Garcia on behalf of Mr. Bridge.

9          To echo some of the comments of Ms. Barry, Your

10  Honor, I think in terms of what the court is going to consider

11  today, or if the court is going to make the determination today,

12  if there is to be any sanction, those sanctions should not

13  interfere, hopefully, with Mr. Bridge's ability to prepare his

14  defense in connection with this case.

15          As this court knows, I think, we on behalf of

16  Mr. Bridge, are up at the forefront of Mr. Bridge's efforts to be

17  able to prepare his defense.

18          THE COURT:  Has there been an incident report

19  prepared with regard to the allegations about your client?

20          MR. GARCIA:  I have no information with regard to an

21  incident.

22          THE COURT:  Let me inquire.  Can you tell us,

23  Mr. Kamenstein?

24          MR. KAMENSTEIN:  Yes.  There have been two incident

25  reports prepared.

1          THE COURT:  And what are the results of those

2     reports, if we know?

3          MR. KAMENSTEIN:  May I have just a moment, Your

4     Honor?

5          THE COURT:  Of course.

6        (Counsel confers with acting warden.)

7          MR. KAMENSTEIN:  The best answer I can give the court

8     is that they're in a process.  They are going to a disciplinary

9     committee.  If they are serious enough, then they go to a next

10    level, disciplinary officer, and there is an ultimate

11    determination.  So they're in that process.

12         THE COURT:  And I take it that at least one

13    allegation is possession of a homemade weapon?

14         MR. KAMENSTEIN:  Yes, Your Honor.  And the other

15    would be refusal to leave the cell when asked to do so.

16         THE COURT:  All right.  Thank you.  Go ahead,

17    Mr. Garcia.  I'm sorry.

18         MR. GARCIA:  Whatever the outcome of that

19    administrative proceeding, Your Honor, and how it may be reported

20    to this court and how this court may fashion an order with regard

21    to our ability to continue to meet with Mr. Bridge, we would

22    expect and hope that the court will issue or fashion an order

23    that will allow Mr. Bridge his continued Sixth Amendment right to

24    counsel to effectively prepare for this case.  As I was just

25    indicating, Your Honor --

THE COURT:  Mr. Garcia, what you and every other one
of the lawyers here has to indicate to your respective clients is
that they are the ones who can determine whether or not they will
have complete access.  We're not just going to look at how you
feel about your client and whether you fear him or her or not.
That is not what we're talking about.  We're talking about the
totality of the circumstances.  A term that you know well that we
use in too many sectors of the law.

But here, I'm talking about how they handle
themselves while they're within the system.  And if they don't
adhere to the rules, then they don't have a right to have full
access as other people who do comply with the rules would have.
And if you can't make that clear to them, I will.

MR. GARCIA:  Understood, Your Honor.  And I will on
behalf of Mr. Bridge.  We will.  And to that end, Your Honor, I
think what is also telling for the court is a little bit further
information that may be helpful to the court.  Mr. Bridge has
been in federal custody since at least, I believe, September of
1999.  And since at least October of 2000 he has been subjected
on a monthly, at a minimum monthly basis to a urine analysis.
And to my knowledge it's my information that every one of his
results for his urine analysis have come back negative.

It's of coincidence to me, Your Honor, that there is
a search of Mr. Bridge's cell the day after being informed by MDC
staff attorney Sonia Cole that Mr. Bridge is going to now enjoy,

as well as all the other defendants with the exception of Mr.

Hayes, legal visits without restraints.  I would be curious, Your

Honor, whether or not any of the other individuals, and I don't

encourage that any of their cells need to be searched, but I

would be curious, Your Honor, whether or not any of their cells

were also searched.

To provide the court a little bit further

information, when I received that information on Tuesday morning

at about 9:30 a.m. from Ms. Cole, I asked when it would be

effective, and she indicated that it would be effective

immediately; however, in practicality probably not until

Wednesday.  I asked her, I said if it's at all possible, let it

be done on Tuesday.  I would appreciate it because I had already

a planned visit with Mr. Bridge.  She said she would do what she

could to that end.

I went forward with my intent to meet with Mr. Bridge

because I believe that, with or without restraints, I would be

able to at least have my meeting with him and thereafter enjoy my

meetings with him without legal restraints.  When I attempted to

enter the institution on Tuesday afternoon, I was initially

stopped by one officer.  I'm not sure if he's an officer.  I

don't know his title, but an individual named Mr. Brisco who

indicated to me that there was concern on MDC's part that

Mr. Bridge may be under the influence and they would prefer that

I not go forward with my legal visit that afternoon.

1    I informed Mr. Brisco I didn't have any objection to

2    going forward with my legal visit.  Then he went and spoke with

3    Acting Associate Warden Gregory who then came down and indicated

4    to me, "What don't you understand, Mr. Garcia?  I'm telling you

5    that Mr. Bridge is under the influence.  It's not safe for you.

6    I make that call."  Meaning Mr. Gregory.  "And you cannot go up

7    there."

8    I find it coincidental, Your Honor, that it happened

9    on the same day that we had just been informed that Mr. Bridge

10   would then be allowed to have his visits without restraint.

11       THE COURT:  Coincidences do occur.

12       MR. GARCIA:  But before that, Your Honor, just at a

13   meeting two weeks prior I was not able to attend to accommodate

14   Mr. Gregory's schedule, a meeting that Ms. Barry, Ms. Blanco and

15   Mr. Rubin were able to attend, Associate Warden Gregory indicated

16   at that meeting that all of the individuals involved in this

17   case, with the exception of Mr. Hayes, had been model inmates.

18   "Model" were his words, Your Honor.

19       And then to now begin to step up this process on

20   behalf of Mr. Bridge -- on their effort with Mr. Bridge, we have

21   been at the forefront on behalf of all of the defendants to be

22   able to have all of the defendants enjoy a right to be able to

23   effectively prepare their case.  We will counsel Mr. Bridge with

24   him understanding that it is a privilege that he will hopefully

25   continue to enjoy.

1    With regard to the allegations that have come

2 forward, this is the first information we have.  As we walked

3 into court today, I was confronted with these photos.  We would

4 ask the court to allow Mr. Bridge to continue to have his visits.

5 Yesterday we had a visit without incident, Your Honor.  It was

6 the first visit that I could tell the court that I was able to

7 see a difference when I was meeting with Mr. Bridge because he

8 was not shackled while we were meeting.  And it's my

9 understanding that before he is brought into any meeting with

10 counsel, they are searched.

11    And his legal box, I believe, is combed through for

12 what MDC may be concerned would be contraband.  Mr. Bridge has at

13 his forefront, Your Honor, what he wants to do is be able to meet

14 with counsel so that he can begin to prepare the defense of his

15 case, which he may face the death penalty in this case depending

16 on what the government's ultimate position is.  There is extreme

17 frustration on his part.  And we have been litigating this issue

18 since at least August of last year when the court issued its

19 first order and we had to come back to court, the number of times

20 we've had to come back.  I can assure the court that we will

21 counsel Mr. Bridge and have him -- and he hears the court today,

22 that it is a privilege he will enjoy in terms of the preparation

23 of the defense of his case.

24    THE COURT:  All right.  Except that I'm indicating

25 it's a right, but rights can be abridged.  I don't suggest that

1   it's a privilege to be able to meet with counsel.  It's a right

2   under our Constitution.  You have that right, but you can lose

3   that right.  And I speak to all the defendants when I say that.

4   It's up to you individually.  As I say, I'm not going to hold any

5   one individual accountable for what others do.  Each one is going

6   to have to assume the responsibility to maintain that right.

7   Anything else?

8           MR. GARCIA:  Nothing further, Your Honor.

9           THE COURT:  Let me just deal with this issue first.

10  I'm willing to, if the acting warden is willing, to allow every

11  one of these individuals including Mr. Hayes and, indeed,

12  Mr. Bridge, the opportunity of meeting with their respective

13  counsel without any restraints.  But I want you to know, very

14  clearly, if you violate any of the rules of the institution, you

15  can lose that right even though it has nothing to do with your

16  counsel.  So keep that in mind.  And I'm willing, as I say, to

17  start with a fresh slate, as it were, right now.

18          But if, indeed, the warden determines that any one of

19  you has lost that right, I want to know why.  But I more than

20  likely will go along with the warden on that.  So if there is

21  anyone here who doesn't understand what I'm saying, raise a hand

22  and let me know.  I don't see any hands.

23          All right, Ms. Barry.

24          You have something further at this time, Mr.

25  Kamenstein?

1    MR. KAMENSTEIN:  Yes.  May I just ask the acting

2  warden whether he wishes to be heard on Your Honor's ruling if

3  Your Honor will give him an opportunity to be heard?

4    THE COURT:  Certainly.

5    (Counsel confers with acting warden.)

6    MR. KAMENSTEIN:  Adam Kamenstein for the United

7  States.

8    Your Honor, if I might just summarize what Acting

9  Warden Gregory's concern is with respect to your ruling, and if

10  he wishes it to be fleshed out, happy to do that.

11    In addition to past incidents with respect to

12  defendant Hayes, the acting warden's concern is also equally that

13  defendant Hayes is a validated member of the Aryan Brotherhood.

14  As Your Honor knows, one of the criteria that any prison facility

15  has to use in deciding what security measures to take are past

16  incidents with that individual.  Defendant Hayes, as a validated

17  Aryan Brotherhood member, is being accorded the exact same

18  security procedures that the defendants in the Aryan Brotherhood

19  case are all being accorded.

20    Acting Warden Gregory's concern is that based on Your

21  Honor's ruling, the court may be giving impetus to every

22  defendant in the Aryan Brotherhood case to thereby litigate the

23  nature of security measures that have been instituted against

24  them as well.  And I think what ultimately may happen under that

25  circumstance is not only in this courtroom, but in that courtroom

or any other courtroom will have a situation where Your Honor or

another judge will be essentially put in the position of being

special master over the MDC and deciding security, the litigation

of security issues with respect to every inmate.

And MDC, in an exercise of its discretion, based on

defendant Hayes' past incidents as well as his membership in the

AB, has already made a decision as to the appropriate security

measures with respect to the defendant Hayes.  And I submit that

we may be opening up a Pandora's Box of litigation by quashing

the decision that they have already made on an individual basis

with respect to defendant Hayes.

THE COURT:  We're all in the business of litigation.

That's why we're here.  Now, if you are going to tell me you want

to continue with what is becoming nonsense, as far as I'm

concerned, rather than getting to the meat of the issues that are

going to have to be finally determined one way or the other, then

we can go ahead and do that.  If the warden wants to go to the

9th Circuit, he may do so.  I have indicated what I'm willing to

do.

And again, I'm not going to hold this individual,

Mr. Hayes, accountable for what others may have done, or indeed,

what he did in the past if he gives me his word now that he is

not going to be a threat and he can meet with his counsel without

being shackled.  And I'm willing to have you litigate this to the

Supreme Court.  I don't care.  If you want to carry this on -- I

1   would like to get to the heart of this case and get it over with

2   frankly, but if you want to go on with it, that's fine.  But I

3   have indicated to you what I want to do with this case.

4            MR. KAMENSTEIN:  Your Honor, please don't infer that

5   I'm trying to threaten litigation.  I'm just trying to raise the

6   concerns that have been voiced.

7            THE COURT:  I understand the concerns.  But again,

8   they're not really my concerns.  My concern is to see that

9   everyone here gets a fair trial, both the government and the

10  defendants.  And I intend to do that.

11           Now, as I say, if something happens in the future,

12  that is different.  But I'm willing to have a clean slate up to

13  now.  We'll see what happens.  I'm not talking about anybody's

14  perceived membership in any organization or anything else.  I

15  don't really care about that.  And I understand the warden has to

16  care about it, but the warden also understands my ruling.  And if

17  he doesn't like my ruling, he knows that you, as his lawyer, can

18  go ahead and appeal it.  That's fine.

19           MR. KAMENSTEIN:  Thank you, Your Honor.

20           THE COURT:  All right.  Ms. Barry.

21           MS. BARRY:  Thank you, Your Honor.  If the court has

22  made its ruling with regard to Mr. Hayes, I'm going to leave that

23  subject alone.  Thank you.  And it might be appropriate at this

24  time, Your Honor, if the MDC personnel are not needed -- I don't

25  have any other issues with MDC personnel.  And speaking for

Mr. Hayes, as far as I'm concerned, they may be excused subject

to the court --

THE COURT:  That's fine.  I appreciate their being

here.  Thank you all.  You're free to stay if you choose to, but

you don't have to.  Go ahead.

MS. BARRY:  A couple of other issues have come up.  I

think that the most burning issue in terms of the defendants, I

have conducted an informal poll among defense attorneys with

regard to preparedness for trial in March, on the trial date that

is currently scheduled.  And I have been in discussion with the

government as well on this subject.  The government has indicated

to me that they intend to be ready to go on this scheduled trial

date.  Almost all counsel -- and I haven't spoken to all of them

-- have indicated that they prefer a continuance because we

don't, we, speaking as a group, don't feel we're going to be

ready to go to trial.

THE COURT:  Has determination been made with

everybody who has been declared to be death eligible?

MR. AVEIS:  Mark Aveis for the government.  No

decision has been made, Your Honor.  And on the point of the

trial continuance, the government has advised -- Mr. Garcia was

the point person for the defense on that issue -- that provided

the defense were to make a pitch for trial continuance not later

than today, the government would generally not oppose that.

THE COURT:  I don't see how you can if you and

1    Mr. Ashcroft have not made a determination on whether you are

2    going to charge these individuals who are death eligible with the

3    death penalty.  Do we have any sense of when we might have a

4    decision?

5              MR. AVEIS:  No, not at this point, Your Honor.  I

6    have had some general discussions with defense counsel who are

7    involved specifically with death penalty issues, but I'm neither

8    at liberty to disclose it.  But I can generally say that were

9    they to ask for a trial continuance beyond March 18 at this

10   point, it would not be unreasonable.

11             THE COURT:  I don't think it would be unreasonable if

12   I don't have some decision before March 18 for me to dismiss any

13   death penalty charges and then maybe we can get a decision,

14   because then it would more than likely be appealed and we'll see

15   where we are.

16             MR. AVEIS:  Loud and clear, understood.  And I will

17   communicate that to the powers that be that are involved in the

18   decision.

19             THE COURT:  All right.  Thank you.

20             MS. BARRY:  With regard to a proposed continuance

21   date, it seems to be the general consensus among counsel with

22   whom I have spoken that a date in the fall appears to be

23   workable.  That is, of course, I can't speak for the two

24   defendants who are facing the death penalty and their

25   requirements to prepare.  But assuming that things go forward, I

1    think most people have indicated a fall date would be available

2    for us, and that's what we would be seeking.

3              THE COURT:  Mr. Kamenstein, what is your best

4    estimate on the time frame here for the trial of the matter if we

5    actually get it to trial which I'd like to do?

6              MR. KAMENSTEIN:  I'm sorry, Your Honor.  I'm not

7    understanding.

8              THE COURT:  What is your best estimate on trial?

9              MR. KAMENSTEIN:  On the --

10             THE COURT:  The requirement.  The amount of time if

11   we finally get it to trial.

12             MR. KAMENSTEIN:  I understand.  I think the estimate

13   at this point is six months.

14             THE COURT:  All right.

15             THE COURT:  We may have to work it around other

16   matters that will be pending.  I know Ms. Kato who has been with

17   me for over 23 years isn't going to be happy with this, and I

18   don't want to go back to it, but I used to be the only federal

19   judge in the country who did night court regularly.  And I made a

20   mistake in not selling the rights to NBC.  They had their own

21   Night Court.  But we may have to go back to that.  And that would

22   put a real strain on the Marshal Service too, I know, but that

23   may be the only way we can handle this properly and give the

24   defendants their rights totally.  All right.

25             Ms. Kato, can we move this to the fall?

1    THE CLERK:  Your Honor, there are counsel absent so

2  perhaps we should set the matter again for another status

3  conference.

4    MR. RUBIN:  Your Honor, on behalf of the attorneys

5  that I'm standing in for, I have talked to all of them and I know

6  what their opinions are.  And they're all asking for continuance.

7    THE COURT:  We still have to have the respective

8  defendants of theirs here if we are going to change the trial.

9  So Ms. Kato is right, we are going to have a status conference

10 regarding trial date.

11   MR. AVEIS:  If I may make a suggestion, Your Honor.

12   THE COURT:  Certainly.

13   MR. AVEIS:  We have generally discussed how we might

14 do this, what the logistics would be.  And I think Ms. Barry is

15 prepared to suggest a day or dates and then we can circulate an

16 excludable time stipulation so we don't have to reconvene.

17   THE COURT:  All right.  Let's try that if everyone is

18 in agreement.

19   MS. BARRY:  If the court wishes today, while the

20 defendants are present, to advise them of their speedy trial

21 rights and take any waivers that are necessary.

22   THE COURT:  Right.  And I take it the defendants have

23 been speaking with their own lawyers so you know that you do have

24 various rights under Speedy Trial Act.  And if you object to a

25 continuance, you should let me know and I'll ask you to rise and

1    let me know.

2            Mr. Stanford, on behalf of your client, is there some

3    problem?

4            MR. STANFORD:  I do not have an objection to a

5    continuance of the trial date.  But at the proper time I want to

6    address the date of trial and a few other issues.  It will become

7    clear what my problem is.

8            THE COURT:  Following Ms. Barry we'll hear from you,

9    Mr. Stanford.

10           MS. BARRY:  Putting aside the date then for a new

11   trial, I think the other issues that remain unresolved are the

12   continuing discovery released by the government.  Now, I have

13   been in communication with Mr. Aveis both orally and in writing

14   with regard to certain items of discovery that we have identified

15   that are referred to in discovery.  For example, there is a

16   number of incidents that happened on the prison yards at the

17   various institutions.  Within the reports that we have received

18   there is an indication that there were audio and video tapes;

19   that there were some other kinds of evidence that was either made

20   or seized which is still outstanding.

21           And I have given Mr. Aveis a series of details

22   listing the items that it is that we're seeking and where in the

23   Bates stamp among the discovery the item is referred to.

24   Mr. Aveis has informed me in writing that the government has been

25   making efforts to track down and retrieve those various items of

1   discovery, and has further indicated to me that -- and I'm just

2   looking -- I just want to put this on the record so it's all

3   clear.  We don't at this moment have a dispute.  But what my

4   concern is, I'm looking for some kind of a time frame here.  And

5   I don't know whether Mr. Aveis can give us a time frame by which

6   he expects to be able either to get the evidence that is still

7   outstanding or make a determination that it's already been

8   destroyed or somehow is out of the hands of the various

9   institutions.  But I think we need that in order to frame certain

10  subjects that can come up in pretrial motions or issues at trial

11  so we can focus on what is there and what is not there.

12          THE COURT:  Certainly.  Mr. Aveis, you don't have a

13  best estimate of when you might be able to respond that

14  everything has already been turned over or when you expect it to

15  be turned over?

16          MR. AVEIS:  The discovery requests are divided into

17  two areas.  The stuff that we have and the stuff we need to get

18  to everyone.  As to the latter part, the stuff that we need to

19  get to everyone, most of that is in the hands of the California

20  Department of Corrections.  And because it's a different agency

21  and a totally different sovereign, there are all kinds of

22  channels that we have to go through.  Plus, there are multiple

23  prisons within that system where the items she is mentioning

24  might be.

25          The summary is -- I just talked to my case agent from

1   the FBI, 60 to 90 days would be, I think, a very conservative

2   estimate of how much time before we would get the information or

3   the things or learn they have been destroyed.  I can't make a

4   better estimate because it's an agency over which we have no

5   control.  They respond only to subpoenas.  And it's somewhat of a

6   formal way of obtaining them.  The B.O.P. would be a different

7   story.

8              THE COURT:  They'll probably claim they're out of

9   money before long, too, like the rest of the state.

10             Let's try to set a 60-day outside date.  What is the

11  60-day date, Ms. Kato, having all discovery in?

12             THE CLERK:  Make it for the end of March, Your Honor.

13  March 31.

14             THE COURT:  March 31.  And if necessary, maybe you

15  should perhaps enlist the aid of the media to let you know there

16  is this separate sovereign that doesn't want to assist you in

17  getting this matter properly taken care of.  All right.

18             MS. BARRY:  There is another specific item of

19  discovery that I wanted to -- that I have spoken about with

20  Mr. Aveis, and I just want to make the court aware of as well,

21  and that is this:  We are aware of the fact that this case is

22  largely driven by confidential informants who are also either

23  currently inmates or have been inmates within the California

24  Department of Corrections system.  As the court is probably

25  aware, those inmates, if they make non attorney-client phone

1  calls are subject to being taped for any phone calls that they're

2  making.  And I have asked Mr. Aveis to provide to us, to have

3  preserved and provide to all the defendants the tape recordings

4  of any telephone calls made by any of the confidential informants

5  that the government may use.

6        And I think that this is Brady material or at least

7  it's potentially Brady material.  It's not uncommon, as I'm sure

8  the court is aware, that people who are confidential informants

9  who are in the criminal world continue their criminal activity at

10  the same time that they're attempting to get a benefit from the

11  government by informing on their codefendants.  And that is the

12  kind of information that is potentially gleanable from those

13  telephone calls.  I'm not certain whether or not the government

14  has, in fact, acted upon that request that these telephone calls

15  be preserved and collected for our review.

16        THE COURT:  They should be, of course, collected,

17  preserved and made available for the court's review, not

18  necessarily for the defense review at this point.

19        MS. BARRY:  I think that another of my co-counsel had

20  a discovery issue since we're on the discovery.

21        THE COURT:  Why don't we get that out of way then

22  I'll hear from Mr. Stanford.

23        MR. RUBIN:  Good afternoon, Your Honor.  Dale Rubin

24  on behalf of Ty Fowles.

25        Your Honor, we have been taking kind of a unique

1  approach to this case.  We have actually been trying to prepare

2  the matter for trial and prepare a defense.

3           THE COURT:  That is unique.

4           MR. RUBIN:  When this case was originally being

5  handled by Charlaine Omeida, she and I had several discussions

6  regarding the specific incident in the indictment that my client

7  is charged with, and specifically photos and videotapes of the

8  incidents in the yard at the specific prisons which she informed

9  me she had and had reviewed.  I still don't have those, and I

10  understand that the government is now indicating that those items

11  have not yet come to their possession from the Department of

12  Corrections.

13           THE COURT:  Perhaps you are not talking about the

14  very same items.

15           MR. RUBIN:  Well, that may be.  But we have -- my

16  client on a number of these charges has already been charged in

17  state court, and those matters have gone forward and been

18  adjudicated.  So we know what exists as far as photos, photos of

19  victims, photos of my clients or videotapes of the incident

20  occurring in the yard.  And this is going to form, as far as my

21  defense is concerned, the basis of our case.  And we need these

22  items as quickly as possible.

23           THE COURT:  It sounds like they're a matter of public

24  record already.  And have you made some effort through, I take it

25  it was superior court somewhere, to obtain them yourself?

1        MR. RUBIN:  I have sent my investigator to Kern

2   county who has obtained certified copies of the court files

3   regarding those cases.

4        THE COURT:  You've not been able to locate the items

5   in which you are interested?

6        MR. RUBIN:  It didn't go to trial.  In one

7   preliminary hearing that evidence was not admitted.

8   Unfortunately we're having a situation similar to the

9   prosecution.  The district attorney is not cooperating with us

10  and providing us with information.  And my client's public

11  defender has been looking for the materials for a month or so.

12       But we're trying to do this.  And until we can get to

13  a position where we have had these and reviewed them, it's as if

14  we have a problem even going out and interviewing witnesses.  So

15  this is a matter of utmost importance to the defense.

16       THE COURT:  I would think it would be a matter of

17  utmost importance to the government as well.  I don't see how

18  they can proceed unless they have some of this very same

19  information.

20       MR. RUBIN:  That I wanted to bring to the court's

21  attention.  Also, if I could at this time on behalf of Mr. Bakman

22  who is representing Mr. Langenhorst, and I know we got off of the

23  MDC issue, my understanding is he submitted some documents to the

24  court regarding Mr. Langenhorst's medical condition.  And the

25  court has made some orders regarding Mr. Langenhorst being

examined by doctors.

I wanted, since Mr. Bakman is not here, I wanted the court to know that has not taken place, and I know that Mr. Bakman is concerned because these are medical conditions that could be life threatening.

THE COURT:  I think we have at least one of the attorneys still here from the MDC.  I would appreciate it if you would look into this and make a report to Mr. Kamenstein, Mr. Aveis within the next 48 hours, please.  And where we are on that, I want some status report with regard to a lawful order of the court being carried out.

MR. RUBIN:  Thank you, Your Honor.

THE COURT:  All right.  All right, Mr. Stanford.

MR. STANFORD:  Thank you.  Thank you very much, Your Honor.  On behalf of Mr. Prescott I have a few issues to raise and I'll get right to them.

The most prominent issue of concern to me is the fact that as we sit here, there is a violation of the Speedy Trial Act and the rights of my client, Mr. Prescott, on the Sixth Amendment.  And I'll explain why I say that.  Mr. Prescott came into the jurisdiction of this court approximately on the 8th of April of last year.  On June 21 of last year we got our first discovery batch, 6,000 pages.  On November 14 of last year we got the second discovery batch, five months later than the prior one.  On December 21, '02, last year, not even a month ago, this is

1    what happened.  We got a quarter-inch paperwork indicating, guess

2    what?  There has been a wiretap interception going on.  And the

3    first 10-day rule allowing the inception by Judge Real and these

4    documents occurred a year and a half ago.

5              I will cite one case which the court I'm sure is

6    aware of.  In the Supreme Court case of Barker against Wingo,

7    B-a-r-k-e-r against Wingo, W-i-n-g-o.  407 U.S. 514, 1972.

8    Justice Powell spoke with the majority with regard to a gentleman

9    who was not brought to trial for murder because his codefendant

10   was going to be tried first.  And the prosecution promised this

11   person, the first person, that they would benefit the first

12   person if he could wait and wait and wait for the trial to begin.

13             This gentleman did not raise a speedy trial request.

14   He did not ask for a motion to dismiss his case.  Justice Powell

15   -- and I won't delay the proceeding here by going through the

16   whole case.  But essentially at page 530 of the case Justice

17   Powell pointed out that every Speedy Trial Act or speedy trial

18   right under the Sixth Amendment is a case by case basis

19   obviously.  The Supreme Court has no way of knowing what goes on,

20   I mean, with due respect, generally in the trial courts and what

21   we have here.

22             There is a test that the Barker case sets forth.  One

23   of the bases in the test, one is length of delay; one is reason

24   for delay; the other is whether or not how the defendant asserted

25   his right.  And last is prejudice to the defendant.  The second

element, reason for delay, I'm going to focus on.

Any deliberate attempt by the prosecution to delay the trial in order to hamper the defense, so says Justice Powell, should be weighed heavily against the government.  The defendant's assertion of his speedy trial right is entitled to strong evidentiary weight.  We are here in a very unusual situation, if the court does not mind, for me as a lawyer having tried some of these cases before, never have I been this far in days into a case with two months longer to go for the initial trial date with virtually little discovery.

There have been videos mentioned in this wiretap situation.  I don't have any videos.  Obviously the wiretap transcripts have to be outlined.  Obviously there are going to be audio cassettes.  I have nothing.  Nobody has any of this.  I am suggesting that right now even though we have waived the first 70-day period, we are in a default period as far as the government is concerned because of this default -- prosecution delay, post-indictment delay in giving us the prosecution (sic).

I heard able counsel, Mr. Aveis, just say in answer to the court's question, how about getting things from the state government, and the man says it's another government.  That's sort of -- we're sitting here waiting for discovery, and I am just saying that we have to have another trial date.
Mr. Prescott and I are agreeing to another trial date because we're forced to because we can't go to trial.  We cannot go to

trial in two months because we're not prepared, because we're not

prepared because we have haven't gotten the information from the

government which they should have given to us.

THE COURT:  All right.  If you, with regard to this

issue, want to file a motion of any kind in writing, you may do

so, so the government may have an opportunity to respond

properly.

MR. STANFORD:  Fine.  I knew this status conference

was coming up, and it's been sort of an agitating problem.

THE COURT:  I understand.

MR. STANFORD:  Because the defendants are in 8 North

where they are at.  Thank you.

THE COURT:  All right.

MR. STANFORD:  The next point I'd like to raise is

supplies, preparation materials and so on.  That is easily

solved.  I don't believe the defendants have them yet.  I'm

talking about paperwork to help their lawyers to document things,

defense materials.  There is a Supreme Court case which documents

this due process right.  It's Wolff, W-o-l-f-f, against McDonald,

418, U.S. 539 1974 case.  And in Gloth, G-l-o-t-h versus Kangas,

K-a-n-g-a-s 951 F.2d 1504, our 9th Circuit, 1991, Justice

Pregerson and two others on the panel, granted a summary judgment

in favor of a prisoner who didn't get any materials.  And the

court pointed out that this was a due process right that even

people who are incarcerated have.

1    THE COURT:  What specific materials are you talking

2    about, Mr. Stanford?

3    MR. STANFORD:  Well, I think the individual materials

4    perhaps can be, by consensus, directed to the Bureau of Prisons

5    as to what they need.  I'm not sure.  I don't know what they

6    would like.  I can't detail it out.  Talking about yellow pads,

7    writing materials.  I understand there is now a video for the

8    videos, a video projector for the videos which I don't have yet,

9    in 8 North or somewhere.

10    But as to the actual detail of what materials, maybe

11    somebody else can fill in.

12    THE COURT:  I see Ms. Barry rising.

13    MS. BARRY:  If I may, just as a point of information,

14    when we had that meeting with the MDC staff, I pointed out to

15    her, to Ms. Cole that there was an issue among the defendants

16    that they needed materials in order to be able to collate their

17    discovery, be able to organize it and such.

18    THE COURT:  Did you spell out the types of materials?

19    MS. BARRY:  I did and it all got resolved.  Let me

20    just let the court know that the resolution was that Ms. Cole

21    asked me to draft a letter to her indicating which materials that

22    the defendants needed to have, and that they would make a

23    decision at the MDC either to provide those materials through the

24    commissary for the defendants or to permit defense counsel to

25    send it in so that the defendants would have it.

As I understand from my client, the decision that the
MDC has made -- and I haven't heard officially from Ms. Cole --
but decision that the MDC has made is that the defendants may
obtain these materials through the commissary.  That raises -- or
should be able to get it through the commissary.

As I say, I don't have an official final answer from
Ms. Cole.  And the only issue that I will raise with regard to
defendants getting legal materials through the commissary is if
they are an indigent and they don't have the money to pay for
commissary or if their commissary privileges are restricted, as
my client's are, he is not allowed to have any commissary as a
result of his disciplinary hearing --

THE COURT:  Again, I think it's going to be up to
each individual defendant to determine whether he has adequate
access to materials that are necessary.  If he can't afford them
or if she can't afford it, then I would expect them to let
counsel know and counsel can let the court know.

MS. BARRY:  The only reason I interrupted Your Honor
was to let the court know we had, in fact, I think resolved this
issue with regard to the --

THE COURT:  I'm glad to hear it.

MR. STANFORD:  I just wanted to put it on the record.
I'm sure that is correct.  But I'll go on to the next point.

Some weeks ago the court had the grace to go over to
8 North and look over the facilities.  And I believe one of the

1    issues that concerned the court was a camera, or at least a

2    camera eye.  And one of the --

3              THE COURT:  I thought that had been resolved.

4              MR. STANFORD:  Well, I don't know the state of its

5    being resolved.  My client and I are -- Mr. Prescott is hesitant

6    and upset about that item up there.

7              THE COURT:  I was told by the previous warden that

8    the camera would be moved.  Not removed, but moved so that it

9    would not be immediately above the table, but would be placed on

10   the wall.

11             MR. STANFORD:  We're looking right at it in one

12   visiting room.  And I think I heard or understand that there are

13   other cameras going in other locations.

14             THE COURT:  Mr. Kamenstein?

15             MR. KAMENSTEIN:  Yes, Your Honor.  I'm informed by a

16   representative from the MDC it has been moved and is no longer

17   overhead.

18             THE COURT:  That's my understanding.

19             MR. KAMENSTEIN:  I have never been in the room.

20             THE COURT:  Yes.  All right.

21             MR. STANFORD:  The next point I would like to make is

22   there was reference to an event, one of the alleged events of one

23   of the defendants with regard to the toilets.

24             THE COURT:  Yes.

25             MR. STANFORD:  There are now no ways in which the

1    inmates can flush their own toilets.  I have to raise this

2    because it has caused anxiety to Mr. Prescott.  I'm being very

3    straight about it.  And we have been talking about toilets and

4    other things other than the issues in this case.  There is a

5    button on the outside of the cells and they can relieve the

6    congestion in the toilet only if a guard does it.

7              I do not know why.  If there is a security problem

8    and they can't air it openly, let them maybe appear in camera to

9    the court and explain why these buttons are hanging outside their

10   cells.  The men are being treated as less than human.

11             THE COURT:  Mr. Kamenstein may have some response to

12   that.

13             MR. KAMENSTEIN:  I'm informed by MDC the reason that

14   the plumbing system was changed is because defendants housed in

15   MDC were found to be passing notes and things through the

16   plumbing system.  It's a method known as fishing by tying a

17   string like the one that was recovered from defendant Bridge's

18   cell, attaching something to it.  A note can be passed from one

19   cell to another.  Orders can be given, communications can be had

20   that are proscribed.

21             Additionally, there were, I guess a suicide or

22   concerns of suicide.  There was one suicide that was able to

23   occur taking advantage of the plumbing system as it was.  It's

24   for those reasons that the plumbing system has been changed.

25             THE COURT:  Understanding that this is within the

1    province of the Bureau of Prisons, I would still expect, however,

2    that given their decision to go this route, that they would also

3    take the precautions to see that safety, health and other

4    measures are also in place.  And one of those would be a prompt

5    flushing of the toilets no matter who has to do it.  Frankly, I

6    wish I had someone to flush mine.

7              I would want to have it done though.  I wouldn't want

8    it to just linger there.  It's not something we ask the law

9    clerks to do.  I just hope that the Bureau of Prisons will take

10   that to heart and try to promptly take care of the flushing.  But

11   I don't, at the same time, want to see any gamesmanship on the

12   part of any of the defendants either with regard to this kind of

13   an issue.  It shouldn't be an issue.

14             MR. STANFORD:  That's correct.  But I don't know

15   that, that's why I request --

16             THE COURT:  And I appreciate your putting it on the

17   record.

18             MR. STANFORD:  -- some sort of in camera discussion.

19             THE COURT:  If that turns out to be necessary, but I

20   think Mr. Kamenstein has already addressed it.  What else do you

21   have?

22             MR. STANFORD:  The only other thing I have, Your

23   Honor, is I'm curious when the confidential file of Mr. Prescott

24   might be released to me.  Remember, that was the file that I

25   indicated in August of last year.  And I am respectfully saying

that I'm available any time the court is --

THE COURT:  We'll try to get that to you within the next 30 days.

MR. STANFORD:  Thank you.

THE COURT:  Anyone else wish to be heard from the government or defense?

Hearing nothing further, what are we going to do about this trial date?  What was that suggestion, Mr. Aveis, that indicated -- have you and Mr. Garcia talked about this?

MR. AVEIS:  Whoever for the defense has the laboring oar, they can throw out the date and the court can get waivers from the defendants, then we can circulate a suitable time stipulation.

MS. BARRY:  We didn't actually pick a day.  We just generally said fall.  Some people said September, some people said October.  I think the general consensus was fall.  I know Mr. Nishi may have an issue with that because I think he has a planned vacation for January which, if this case actually goes six months, might impact his vacation.  But I'll let him speak to that.

THE COURT:  It seems to me that we're going to have to certainly talk about the middle of October or forward.  And I think there may be others who will have problems, but I think they're going to have to work around the problems.

Ms. Kato, what is the second or third Tuesday in

1   October?

2   THE CLERK:  That would be October 21, Your Honor.

3   THE COURT:  Let's try October 21, 2003.  And we'll

4   attempt to gather waivers from those defendants who are not

5   present here today.  Anyone else wish to be heard today?  If not.

6   Thank you all.

7   MR. AVEIS:  Your Honor, would you mind taking4 the

8   waivers of the present defendants and we can circulate the others

9   in writing?

10   THE COURT:  Yes.  Let me just go down the line.

11   Mr. Hayes, you have heard the need for a continuance

12   in this matter.  You understand your rights under the Speedy

13   Trial Act.  Do you have any objection?

14   DEFENDANT HAYES:  No.

15   THE COURT:  Thank you.  Mr. Lowery here?

16   THE CLERK:  No, Your Honor.  There was a waiver of

17   presence.

18   THE COURT:  All right.  Mr. Bridge.

19   DEFENDANT BRIDGE:  Yes, sir.

20   THE COURT:  Do you have any problem with the

21   continuance in this matter understanding that you have certain

22   rights available to you under the Speedy Trial Act?  And this

23   continuance would carry us beyond that period that you have

24   guaranteed to you.  Any problem with the continuance?

25   DEFENDANT BRIDGE:  No, sir.

1    THE COURT:  Thank you.  Is Mr. Roberg here?

2    THE CLERK:  No, Your Honor.  Mr. Roberg has a waiver

3  of presence.

4    THE COURT:  Mr. Langenhorst?

5    DEFENDANT LANGENHORST:  Yes, sir.

6    THE COURT:  Do have any problem with continuance to

7  October 21, 2003?

8    DEFENDANT LANGENHORST:  No.  I'm fine, Your Honor.

9    THE COURT:  All right.  Thank you.  Mr. Fowles?

10   DEFENDANT FOWLES:  Yes, Your Honor.

11   THE COURT:  Do you have any problems with the

12  continuance?

13   DEFENDANT FOWLES:  I have no problem.

14   THE COURT:  Thank you.  Mr. Richie here?

15   DEFENDANT RICHIE:  I'm here.

16   THE COURT:  Do you have any problem with the

17  continuance to October of 2003, sir?

18   DEFENDANT RICHIE:  No.

19   THE COURT:  Thank you.  Mr. Baltimore?

20   DEFENDANT BALTIMORE:  Yes, sir.

21   THE COURT:  Do you have a problem at all with this

22  continuance?

23   DEFENDANT BALTIMORE:  No, Your Honor.

24   THE COURT:  Thank you.  Mr. Prescott?

25   DEFENDANT PRESCOTT:  No, sir.

1   THE COURT:  Thank you.  Mr. Johnston.

2   THE CLERK:  Your Honor, he has a waiver of presence.

3   THE COURT:  All right.  Mr. Mowatt?

4   DEFENDANT MOWATT:  Yes, sir.

5   THE COURT:  Do you have a problem with the

6   continuance, sir?

7   DEFENDANT MOWATT:  No, sir.

8   THE COURT:  And Ms. D'Anna?

9   DEFENDANT D'ANNA:  I have no problem, sir.

10   THE COURT:  Thank you, ma'am.  All right.  Thank you

11   all.  And let's see if we can't all walk a straight line here and

12   get this matter finally concluded.  Thank you.

13   (Proceedings adjourned.)

14   * * * *

15   I, MARIA BEESLEY, RPR, do hereby certify that the

16   foregoing is a true and correct copy of proceedings in

17   the above-entitled matter to the best of my skill and

18   ability.

19

20

21   _____        Dated: _____

22   MARIA BEESLEY, RPR
     OFFICIAL REPORTER

23

24

25